**LAWYERS TITLE INS. CO. v. LAWYERS TITLE INS. CORPORATION.**

No. 7329.

United States Court of Appeals for the District of Columbia.

Decided Oct. 16, 1939.

Rehearing Denied Nov. 30, 1939.

Writ of Certiorari Denied April 8, 1940.

See —— U.S. ——, 60 S.Ct. 806, 84 L.Ed. ——.

36

Louis M. Denit, Thomas Searing Jackson, and J. Richard Earle all of Washington, D. C., for appellant.

H. Cecil Kilpatrick, of Washington, D. C., and Andrew D. Christian, of Richmond, Va., for appellee.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a judgment dismissing the bill after hearing on the merits as to both law and facts. The parties will be designated as they stood below. Plaintiff sought an injunction restraining defendant from using its corporate name for doing the business of insuring real estate titles in the District of Columbia. The corporate names of plaintiff and defendant are identical except for the difference between the words "company" and "corporation".

Plaintiff is a District corporation, organized in 1896 under the name "Lawyers Title and Guaranty Insurance Company". In 1922 the name was changed formally by omitting the words "and Guaranty". From 1896 to 1922 plaintiff conducted its business, principally certification of titles, entirely independently. In the latter year it made a "working agreement" with two other District title companies, previously competitors, the District Title Insurance Company and the Washington Title Insurance Company, as plaintiff's president testified, to reduce operating costs and give customers greater financial responsibility. The three companies undertook to elect identical officers, occupy a single building, pool equipment, including records (title to those then existing was not affected), issue joint certificates of title, contribute specified sums as working capital, and share profits (and losses) in stipulated percentages (40% to plaintiff) after paying all expenses, including salaries. The agreement provided for termination by vote of shareholders owning two-thirds of the capital stock of any one of the companies. A majority of the stock of each corporation now is held by a fourth, the Consolidated Title Company. The contract appears to embody all of the elements essential to constitute a partnership among the constituent companies, effective, if valid, perpetually except at the will of the holding corporation, Consolidated Title Company.

The contract became effective January 1, 1923, and has been carried out continuously since that date in accordance with its terms. The work involved in certifying titles is done on behalf of all the companies by a single staff with a single plant in a single office. The "cooperating" corporations have identical officers (except directors, who interlock to some extent) and identical employees who are "jointly" paid; maintain (since 1922) a single set of records and indices; collect "jointly" all fees for title certificates and premiums for insurance; keep these in a "joint" bank account, from which they pay "joint" expenses and distributive shares of profits. The latter go to the constituent companies, which keep separate bank accounts from which each pays its own dividends and expenses, principally taxes and license fees.

There is no formal "partnership" name, but in doing business with the public the corporate name of each constituent has become merged in either a full combination or some abbreviation of the three corporate names. Whether in the combination or an abbreviation, the name appearing first is that of the District Title Insurance Company. Plaintiff's name appears in second place, between the other two. This order is followed on printed forms of certificates of title, policies, letterheads, etc., and in official signatures which are made by a single "joint" officer. No separate forms for each company appear to exist. The office building signs are: "1413 The District Lawyers Washington Title Insurance Companies". The findings of fact state that plaintiff and its associates are called generally by the public, "The District Title Company", "The District Title Insurance Company", "The District Title Companies", "The District Title Insurance Companies", "The District Lawyers and Washington", or the "D. L. & W.";[1] that plaintiff is not referred to in business circles as "The Lawyers Title Insurance Company", and that there is no evidence that plaintiff ever acquired a reputation under that name alone.[2]

Prior to 1935, plaintiff's associate, the District Title Insurance Company, qualified to do business in Virginia as a foreign corporation. It does not appear that this business is conducted in any way differently from that done in the District. Presumably, therefore, it is done on behalf of plaintiff pursuant to the "working agreement".

Defendant was incorporated in Virginia in 1925, has its home office in Richmond, and has qualified to do business in seventeen states and in the District. Its business consists exclusively in insurance of titles, not in issuance of certificates. Prior to 1935 it issued policies on property in the District, but only on certificates issued by local title companies, some by plaintiff.

Defendant attempted to induce plaintiff to become its agent in the District, but plaintiff declined. Failing to find another satisfactory agent, defendant qualified in the District in 1935, and on June 13, 1938, opened its own office less than a block distant from plaintiff's. It is admitted that qualification and entry by plaintiff's associate in Virginia had some, but not controlling, influence in causing defendant to qualify to do business in the District.

The trial court found that defendant's entrance into the District was "in the process of the natural and logical development of its business", not only for expansion but to give more efficient service to existing customers; that the location of its office was selected, not to divert business *unfairly* from plaintiff, but because of its nearness to offices of real estate brokers and others having title business; that defendant did not choose its name originally in order to lure business from plaintiff (in fact at that time it had no intention of competing with plaintiff); and that defendant has done all that reasonably could be required of it to prevent confusion of identity with plaintiff.

Evidence sustaining the latter finding shows that on defendant's office door, letterheads, forms, signs, advertising and telephone listings, it has added to the statement of its corporate name distinguishing matter, such as "Home Office—Richmond, Virginia Washington Branch". Similarly distinguishing identification is made orally in answering telephone calls. Distinctive type, color and arrangement, not similar to those used by plaintiff, are employed in signs, letterheads, forms, etc.

The court found further that title certificates and policies are obtained in Washington principally by real estate brokers and lawyers for their clients, and by banks, insurance companies, loan and trust companies and building associations, all of whom are experienced in title matters, will not be misled by the similarity of names, and constitute a discriminating clientele; that there

---

[1] Plaintiff and its associates, as well as the public, use these designations.

[2] In view of the original form of plaintiff's name, including the words "and Guaranty" until 1922, when the "working agreement" gave rise to the combined forms of designation. Some correspondence is addressed to plaintiff in its own name, but much of that referred to in evidence was written by plaintiff's officers or directors, or concerns with which they are associated. In a few instances mail intended for defendant has been delivered to plaintiff. Cf. note 49, infra. Plaintiff's internal dealings, i. e., those involving communications with its shareholders, as in regard to dividends, financial reports, etc., are made in its own name, as, of course, are payments of its taxes, etc. The overwhelming evidence, however, sustains the finding that plaintiff is not known generally by the public purchasing title service as a separate, independent concern doing business in its present and separate corporate name.

is no evidence disclosing any injury to plaintiff by defendant's conduct; and that there is no reasonable probability that plaintiff will suffer injury on account of confusion of identity with defendant, in view of the dissimilarity in publicity created by defendant.[3]

Pursuant to these findings, the court denied relief to plaintiff and dismissed the bill on three grounds: (1) that plaintiff has not shown such similarity of names by which it and defendant are known publicly as to deceive plaintiff's customers and divert their business to defendant; (2) that defendant has done all that reasonably could be required to prevent confusion of identities; and (3) that the services in question are rendered to a discriminating clientele, who will not be misled by "any fortuitous similarity" of the corporate names.

We think the findings of fact are sustained by the evidence and that the judgment was right.

■ The corporate names may be regarded as identical. The stated objects and the enterprises carried on overlap, even in the technical sense, since plaintiff is authorized to issue and to a very limited extent does issue policies of insurance.[4] Further, although there are important technical differences between insuring titles and certifying them,[5] the practical effect of extending title insurance is to curtail certification. The businesses are highly competitive and plaintiff seeks to ward off danger threatening its entire operations.

The case involves no deliberate attempt by one competitor to simulate another or crafty scheme for luring away business by deception. Both parties have conducted themselves honorably and with regard for high conceptions of business ethics. Their subjective attitudes, if material,[6] are not fraudulent or dishonest. The naked question is whether plaintiff has an exclusive right, by virtue of prior appropriation in this jurisdiction, to use the name which each has acquired lawfully and with honest purpose.

The decision below was based on principles applicable in a case presenting issues of unfair competition, in which considerations relating to deception of the public and injury, actual or probable, to plaintiff's business determine the scope of the right and of the remedy applied to protect it.[7]

Plaintiff contends, however, that it has acquired in its name a more absolute right, unqualified by necessity for showing such injury or danger of public confusion. Defendant's right to do business in the District is not, and could not well be, disputed. But if defendant does so, plaintiff asserts, in effect, that it must use a new name, different from that in which it has been incorporated and with which it has built good will in many places. It is the name, therefore, and not merely the business which is done in it, to which plaintiff claims exclusive title and use. Prior in tempore prior [et solus] in jure est summarizes plaintiff's view.

---

[3] Evidence of actual injury hardly could have been produced, since the bill was filed less than a month after the Washington branch office was opened.

[4] During four and one-half years, 1934–1938, plaintiff and its associated corporations issued 39,445 certificates of title and 1,349 insurance policies.

[5] Defendant places some emphasis upon the technical differences in liability, asserting also that its business is insurance and that of plaintiff the practice of law. Important as such differences may be for other purposes, they cannot negative the very real competitive consequences of each type of activity for the other.

The conception of unfair trade no longer is limited to competition in the sale of identical or similar products. "Any act committed by the junior corporation which would cause damage to the credit, or reputation for integrity and fair dealing of the senior corporation, if committed by the latter, would injure it if the public, because of the similarity of the names, should attribute such act to the senior corporation." Standard Oil Co. of New Mexico, Inc. v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973, 977, and authorities cited, particularly in note 1. Cf. Ralston Purina Co. v. Saniwax Paper Co., D.C.W.D.Mich., 1928, 26 F.2d 941; 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2432; Nims, Unfair Competition and Trade-Marks (3d Ed.1929) § 9a.

[6] Cf. Handler & Pickett, Trade-Marks and Trade Names (1930) 30 Col.L.Rev. 168, 759 at 769–777; Annotation 66 A. L.R. 948, 954-957. But see Eastern Const. Co., Inc. v. Eastern Engineering Corp., 1927, 246 N.Y. 459, 159 N.E. 397, 399. Apparently the absence of subjectively fraudulent motive cannot overcome a confusing effect created by identity or similarity of name; but the presence of one conduces to aid the court in finding that such an effect exists.

[7] Cf. Nims, op. cit. supra note 5, c. 2; and notes 30–32, infra.

The basis of the claim is not clear in respect to either the source or the extent of the right. Whether created as an implied grant from the bare act of incorporation or from that combined with use in trade,[8] questions arise as to the nature and scope of the asserted monopoly of words. Is it a sort of "absolute property", effective to exclude others, without regard to abandonment by the prior appropriator, use by others prior to the incorporation, the presence or absence of competition or possible infringement of good will by the later comer, or, competition existing, to special circumstances overcoming or minimizing probability of public confusion by the merely nominal identity? In other words, is there an exclusive preemption, invariable with time and circumstance, more absolute than the landowner's freedom from invasion or the trade-mark owner's privilege against infringement? Or, on the other hand, is the right less extensive and invariable, dependent on considerations of fair play in business, relative to the total situation and taking account of all its factors, not referable to and defined by the single fact of nominal identity? Whether on some formalistic conception of property, presumably implied from the act of incorporation, or, what is the same thing, of unfair competition coupled with a conclusive presumption of unfairness and of injury from the identity of names,[9] plaintiff asserts that such identity of itself is conclusive against use by any later comer. It claims, therefore, a protection broader and more enduring than that conferred by the trade-mark statutes[10] or by the law of unfair trade.

We find no authority to sustain a right so absolute. No statute confers it in specific terms.[11] Nor does mere incorporation do so by implication.[12] Ordinarily, that creates rights in the name which

---

[8] Cf. note 12, infra.

[9] Cf. note 24, infra.

[10] Act of Feb. 20, 1905, 33 Stat. 724, c. 592, 15 U.S.C.A. § 81 et seq. Section 5 forbids registration of a "mark which consists merely in the name of an individual, firm, corporation, or association, not written, printed, impressed, or woven in some particular or distinctive manner or in association with a portrait of the individual". 34 Stat. 1251, c. 2573 (1907). Cf. The Asbestone Co. v. Philip Carey Mfg. Co., 1914, 41 App.D.C. 507; Mansfield Tire & Rubber Co. v. Ford Motor Co., 1915, 44 App.D.C. 205; Howard Co. v. Baldwin Co., 1919, 48 App.D.C. 437. It has been asserted that Congress had the common law principles of unfair competition in mind when it enacted the Trade-Mark Act. Sutherland, J., in American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 381, 46 S.Ct. 160, 162, 70 L.Ed. 317, a dictum going so far as to confine the power of Congress to legislate regarding "the substantive law of trade-marks" to the supposedly prevailing general law of unfair competition.

[11] The District has no statute, such as is common elsewhere [cf. 6 Fletcher Cyc. Corp. (Perm.Ed.) 12 notes 56 et seq.; 66 A.L.R. 948, 951], prohibiting incorporators to adopt a name identical with that of an existing corporation or so similar as to mislead or cause confusion to the public. It is questionable whether such acts do more than codify, for purposes of incorporation, the common law of unfair trade [cf. (1932) 20 Calif.L.Rev. 633, 634 n. 8; notes 12, 14, 22 and 32, infra] or have application to foreign corporations. They are obviously akin to Section 5 of the Trade-Mark Act (cf. the preceding note) in protecting the corporate name.

[12] "It cannot be the law that three or more persons may, either under our general corporation law or by special act of the Legislature, become incorporated by any name which they may select for the purpose of engaging in some branch of trade or manufacture, and thereby, *without engaging in the business* of buying, selling, or manufacturing the article or product named in its charter, acquire a perpetual monopoly in the corporate name." [Italics supplied] Blackwell's Durham Tobacco Co. v. American Tobacco Co., 1907, 145 N.C. 367, 59 S. E. 123, 126, 127. To the same effect are Grand Lodge v. Graham, 1896, 96 Iowa 592, 65 N.W. 837, 31 L.R.A. 133; Rodseth v. Northwestern Marble Works, 1915, 129 Minn. 472, 152 N.W. 885, Ann. Cas.1917A, 257; Waterman Co. v. Modern Pen Co., 1914, 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142. Cf. 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2425 notes 38–40 (distinguishing cases arising under the statutes referred to in the preceding note and those not involving legislation), also §§ 2426, 2429 n. 84, and 2419 n. 51; Nims, op. cit. supra note 5, § 83; (1932) 20 Calif.L.Rev. 633 n. 4; 66 A.L.R. 948, 953. "The name is not imposed by the law, but is chosen by the incorporators. With that selection the sovereignty of the state has nothing to do. * * * The sovereign by the act of incorporation adjudges neither the legality nor the name assumed." The Peck Brothers & Co. v.

may be called broadly, and therefore ambiguously, "property rights". These include the capacity to take and hold property, to contract, to sue and be sued, and to perform other legal acts in the corporate name as well as to be known by it in the purely nominative sense, without reference to any function of excluding others.[13] Further, under ordinary circumstances, a corporation acquires rights in its name which are to some extent exclusive. A prior incorporator may enjoin a later one from assuming an identical or confusingly similar name.[14] The same relief, however, is given to the owner of the name of an unincorporated business.[15] If the first incorporator's name is assumed by another before timely objection is interposed, the assumption ordinarily stands, but use by the second comer in a manner injurious to the first or confusing to the public is enjoined,[16] provided the enjoiner does not wait too long,[17] and subject usually to clarification of identity by addition of sufficiently distinguishing matter in the latecomer's public use of the common name.[18] Similar protection is given to trade-marks[19] and trade names[20] against piracy by subsequent incorporation. A domestic corporation may require a foreign one entering later similarly to distinguish itself and vice versa,[21] but if this is done, generally cannot exclude it.[22]

---

Peck Bros. Co., 7 Cir., 1902, 113 F. 291, 300, 62 L.R.A. 81, certiorari denied, 1902, 187 U.S. 643, 23 S.Ct. 843, 47 L.Ed. 346; 6 Fletcher, supra, § 2415.

Incorporation, like registration of a trade-mark, should preempt the name (if it is susceptible to preemption; cf. notes 32 and 53, infra) for a reasonable period in which to allow business to begin. Cf. Drugs Consolidated, Inc., v. Drug Incorporated, 1929, 16 Del.Ch. 240, 144 A. 656. To this extent incorporation and registration take the place of user in the case of a trade name. Preemption for such a period is not the equivalent of perpetual monopoly without use in trade.

[13] Broadly such uses, though nonexclusive, may be considered "property", since others cannot deprive the corporation of them. Cf. notes 16 and 47, infra.

[14] Either pursuant to statute (cf. note 11, supra) or possibly in the absence of one [cf. 6 Flètcher Cyc. Corp. (Perm. Ed.) § 2419 n. 58]. Authority actually sustaining the specific point is surprisingly small [cf. id. § 2419 notes 58, 59 and 61; (1932) 20 Calif.L.Rev. 633], probably because incorporation usually can be completed before preventive proceedings can be instituted. Some conflict appears as to injunctive interference with the statutory officer's determination of similarity (6 Fletcher, supra, § 2419 notes 61 and 62), but in any event it is reviewable judicially (id. § 2419 notes 67 and 68). Protection against trade-mark registration has been much more clearcut. Cf. the decisions of this court cited in note 10, supra.

[15] Dyment v. Lewis, 1909, 144 Iowa 509, 123 N.W. 244, 26 L.R.A.,N.S., 73; Children's Bootery v. Sutker, 1926, 91 Fla. 60, 107 So. 345, 44 A.L.R. 698; Pettes v. American Watchman's Clock Co., 1903, 89 App.Div. 345, 85 N.Y.S. 900; Eastern Outfitting Co. v. Manheim, 1910, 59 Wash. 428, 110 P. 23, 35 L.R. A.,N.S., 251.

[16] See the authorities cited in 6 Fletcher Cyc. Corp. (Perm.Ed.) §§ 2422, 2424 n. 17; 66 A.L.R. 948, 1022 et seq.

[17] See note 47, infra.

[18] Cf. John B. Stetson Co. v. Stephen L. Stetson Co., Ltd., 2 Cir., 1936, 85 F. 2d 586, certiorari denied, 1936, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446; Waterman Co. v. Modern Pen Co., 1914, 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142; Federal Securities Co. v. Federal Securities Corp., 1929, 129 Ore. 375, 276 P. 1100, 66 A.L.R. 934; Investor Pub. Co. of Mass. v. Dobinson, C.C.S.D.Cal.1897, 82 F. 56; Chickering v. Chickering & Sons, 7 Cir. 1914, 215 F. 490; Farmers' Loan & Trust Co. v. Farmers' Loan & Trust Co. of Kansas, Sup.Ct.1888, 21 Abb.N. C. 104, 1 N.Y.S. 44.

Where the corporate name has acquired "secondary significance" so far that only one source in trade can be indicated by it, as in Standard Oil Co. of New Mexico, Inc. v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973, the only form of relief effective to prevent confusion in trade may be an injunction prohibiting use of the name entirely. If so, resort to conceptions of "property" is not necessary. The law of unfair trade is adequate to supply the full relief required.

[19] Rice & Hutchins, Inc. v. Vera Shoe Co., Inc., 2 Cir., 1923, 290 F. 124; cf. Juvenile Shoe Co., Inc. v. Federal Trade Commission, 9 Cir., 1923, 289 F. 57.

[20] 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2424 n. 18.

[21] International Trust Co. v. International Loan & Trust Co., 1891, 153 Mass. 271, 26 N.E. 693, 10 L.R.A. 758; Federal Securities Co. v. Federal Securities Corp., 1929, 129 Ore. 375, 276 P. 1100, 66 A.L.R. 934; and authorities discussed in 66 A.L.R. 948, 1004-1013.

[22] Cf. 6 Fletcher Cyc. Corp. (Perm.

Some of the opinions speak in terms of "property" as the basis for the exclusion,[23] others in the language of unfair competition with a conclusive presumption of public confusion and of injury to the prior appropriator's business in cases of nominal identity.[24] The larger number frankly assimilate corporate names to trade-marks[25] or to trade names,[26] with results varying somewhat according to the classification adopted but in respects not material here.[27] Frequently "property" and unfair trade conceptions are intermingled.[28]

Whether one or another approach is taken, and except possibly when the issue is prevention of assumption,[29] relief is granted under circumstances, upon considerations and subject to limitations equally applicable either to trade-marks or to trade names.[30] Either confusion of the

Ed.) § 2419 n. 57, asserting that statutes prohibiting identical or similar names require a dissimilar one as a qualification for admission; but, to the contrary, see Nims, op. cit. supra note 5, § 84; 66 A. L.R. 948, 1004–1006; (1932) 20 Calif. L.Rev. 633, n. 3. Illinois appears to stand alone in favoritism to local enterprise. But the line of cases there asserting that a foreign corporation enters the state subject to having its name pirated by a subsequently formed domestic corporation is said to be of doubtful authority on the facts presented (cf. 66 A.L.R. 948, 1004 et seq.) and has not been followed elsewhere.

[23] See the authorities cited in Standard Oil Co. of New Mexico, Inc., v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973, 975, wherein it is said: "This is not strictly a suit to enjoin unfair competition. It is in the nature of a bill quia timet to enjoin the threatened unlawful use of a corporate name", apparently on the premise that actual, present competition is required to maintain the former type of suit, though probable deception and injury also are relied on to support the decision.

[24] American Clay Mfg. Co. v. American Clay Mfg. Co. of N. J., 1901, 198 Pa. 189, 47 A. 936, 937, relying on Ft. Pitt Building & Loan Ass'n v. Model Plan Bldg. & Loan Ass'n, 1893, 159 Pa. 308, 28 A. 215. Both cases relied on Newby v. Oregon Central Ry., C.C.D.Or.1869, Deady 609, Fed.Cas.No.10,144. In both of the Pennsylvania cases, under the circumstances shown, confusion of the public was inevitable. The Newby case held a corporate name analogous to a trade-mark and entitled to the same protection. Probability of injury and inadequacy of legal remedy were emphasized. Cf. also, Paulino v. Portuguese Ben. Ass'n, 1893, 18 R.I. 165, 26 A. 36, 20 L.R.A. 272 and Boston Rubber-Shoe Co. v. Boston Rubber Co., 1889, 149 Mass. 436, 21 N.E. 875. The former involved no question of unfair competition; the latter held that quo warranto cannot be employed by one other than the state to test the right of a corporation to use its name under a corporate name statute.

[25] Newby v. Oregon Central Ry., cit. supra note 24; General Film Co. of Missouri v. General Film Co. of Maine, 8 Cir., 1916, 237 F. 64; Grand Lodge, K. P. of North and South America v. Grand Lodge, K. P., 1911, 174 Ala. 395, 56 So. 963. Cf. United States Light & Heating Co. of Maine v. United States Light & Heating Co. of New York, C. C.S.D.N.Y.1910, 181 F. 182.

[26] Cf. American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Nims, op. cit. supra note 5, § 88. It has been suggested that whether the name be deemed a trade-mark or a trade name depends on whether it is "arbitrary and fanciful" or merely descriptive or geographical. American Products Co. v. American Products Co., D.C.E.D.Mich.1930, 42 F.2d 488; Central Shoe Co. v. Central Shoe Co., Inc., D.C.Mass.1932, 58 F.2d 680; Farmers' Loan & Trust Co. v. Farmers' Loan & Trust Co. of Kansas, Sup. Ct.1888, 21 Abb.N.C. 104, 1 N.Y.S. 44.

[27] Cf. notes 34 and 35, infra.

[28] Cf. Standard Oil Co. of New Mexico, Inc., v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973.

[29] Cf. note 14, supra.

[30] Cf. American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 380, 381, 46 S.Ct. 160, 70 L.Ed. 317; Beech-Nut Packing Co. v. P. Lorillard Co., 1927, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810; (1932) 20 Calif.L.Rev. 633, 637, 639; 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2423; Nims, op. cit. supra note 5, § 92. Though protection still is given to trade-marks in some situations where it would be denied to trade names (cf. notes 34 and 35, infra), the limitations placed on it show that conceptions of unfair trade are its foundation. The right is said to grow out of use, not mere adoption, cf. Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713; but cf. also note 12, supra; exists only as a protection for a business, trade or good will, 240 U.S. 413, 414, 36 S.Ct. 357, 60 L.Ed. 713; Rice-Stix Dry Goods Co. v. Schwarzenbach-Huber Co., 1918, 47 App. D.C. 249; formerly was subject to appropriation for use on noncompeting

public or injury to the plaintiff's business, actual or probable, generally both, will be found implicit in the facts. That these are the unstated assumptions underlying the asserted existence of "property" is shown both by the form of relief ordinarily granted,[31] and the limitations of fact under which it is given.[32]

The limitations thus measuring the scope of legal protection are consistent with a foundation encompassed by preventing or repairing damage caused by confusing or deceptive use in trade. They are not consistent with any notion of absolute property created merely by incorporation and effective to exclude others regardless of time and circumstance. Neither on authority nor on principle do we find that corporate names are given or need protection greater than that accorded to trade-marks and trade names. Such protection (or any degree of exclusion) is irrelevant to the purely nominative function.

The exclusive function has significance only in relation to trade. If a competitive or other use is fair in respect to a trademark or a trade name, we do not see upon what principle it can be deemed unfair in relation to an identical corporate name. For purposes of exclusion its function is not different from that of trade-marks and trade names, namely, to identify source in trade and to build good will toward it.[33] In the absence of trade, present or prospective, and corresponding good will, this function is as meaningless for corporate names as for trade-marks and trade names. Though each protects reasonable expectations for future trade, none serves or should serve solely to exclude others without possible benefit to the originator. Each has unique protections or occasions for protection, but the distinctions are vanishing in the expanding conceptions of unfair trade.[34] With that expansion, sharp and technical differentiations disappear,

---

goods, Hanover Star Milling Co. v. Metcalf, supra, though this doctrine is being qualified in recent cases where good will is endangered by acts other than direct competition, Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., D.C.E.D.Pa.1937, 20 F.Supp. 703; Martha Washington Candies Co. v. Goldstein, D.C.M.D.Pa.1938, 23 F.Supp. 861; Churchill Downs Distilling Co. v. Churchill Downs, Inc., 1936, 262 Ky. 567, 90 S.W.2d 1041, including those extending the "expansion area", Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 8 Cir., 1926, 15 F.2d 920; cannot be assigned in gross, Rice-Stix Dry Goods Co. v. Schwarzenbach-Huber Co., supra; may be lost by acquiescence in use by another continued sufficiently long, Beech-Nut Packing Co. v. P. Lorillard Co., supra, and by abandonment, cf. Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60, Rice-Stix Dry Goods Co. v. Schwarzenbach-Huber Co., supra, laches, id., or degeneration into a generic term, Dupont Cellophane Co., Inc., v. Waxed Products Co., Inc., 2 Cir., 1936, 85 F.2d 75, certiorari denied, 1936, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443. But cf. notes 32 and 47, infra, as to corporate names.

31 Cf. note 18, supra.

32 Cf. notes 12, 16-30, supra. The basic principle is priority in appropriation (whether by incorporation, trademark registration or trade name user) and use, not mere incorporation. The latter gives way to previously acquired trade names, trade-marks, names of individuals and unincorporated concerns, and of foreign and domestic corpora-

tions. Incorporation of itself has no preemptive magic, except, like trademark registration, to replace user of a trade name so as to withdraw it from immediate general appropriation (cf. note 12, supra) and to preserve it, apparently, for a somewhat longer time against abandonment, waiver, acquiescence and laches. Cf. note 47, infra. These differences arose when the full scope of unfair trade protection was unrealized, and so far as they represent merely "hang-overs" from that day disappear with the reasons for them in its expansion. Cf. notes 34 and 35, infra. To some extent, however, they reflect the needs, vital now as always, to shortcut the user process in bringing protection into play and to require definite evidence of termination. So far as they have present validity, they do not contradict the basic principle, but only make the occasions for its application more certain.

33 Cf. Nims, op. cit. supra note 5, p. 171; Note (1930) 30 Col.L.Rev. 695 n. 6.

34 Handler & Pickett, op. cit. supra note 6 [summarizing existing differences at pages 168-169; see also note 30, supra, and John B. Stetson Co. v. Stephen L. Stetson Co., Ltd., 2 Cir., 1936, 85 F.2d 586, 588]; Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713; Beech-Nut Packing Co. v. P. Lorillard Co., 1927, 273 U.S. 629, 47 S.Ct. 481, 71 L. Ed. 810, involving both plaintiff's trademark and its corporate name; American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317.

though need for some important distinctions may remain.[35] Nevertheless no form of earmarking source or product has buttressed itself beyond the reach of equitable limitation. We see no reason for holding that corporate names should be permitted to do so. The considerations dictating the limitations applied in protecting them appear, on the whole, to be related as intimately and extensively to fair play in business as those relating to trademarks and trade names. If they are effective to confine the limits of "property" to reasonable use and benefit in the one class of cases,[36] they should be also in the other. Although "property" may be admitted to exist, whether in a trade-mark, a trade name or a corporate name, that is true, broadly speaking, whenever economic interests are protected by legal process, but only to the extent that they are so protected.

The question remains whether, on principles of unfair trade, defendant's use of its name in the District should be enjoined at plaintiff's suit. Generally the prior appropriator may enjoin use of an identical name by a subsequent arrival.[37] Normally the latter seeks an unfair advantage, a "free ride" on another's established good will; he is subjectively guilty and objectively deceptive. Usually his only purpose is to create confusion as to source, and benefit by it. Ordinarily any other name would serve as well, except to deceive. In such circumstances little evidence of injury, actual or probable, is needed—the mere identity makes it practically inevitable. From this fact comes the idea that a conclusive presumption of unfairness and injury exists. On such facts the presumption should be conclusive. Fair trade protection requires it.

But the presumption is founded on duplication of a name which is the core of another's good will.[38] In the absence of such good will or its attachment to the name, all reason for the presumption and the consequent exclusion falls. If there is no good will or reasonable prospect for it, relief is denied.[39] If either exists, but not in connection with the name simulated, the same result should follow.[40] Had plaintiff, therefore, built and maintained its good will exclusively or distinctively about its present corporate name, authority would support the existence of the asserted presumptions and entitle it to relief, despite the hardship on defendant and its freedom, subjectively, from deceptive intention.[41] But plaintiff has not done so. For purposes of trade as distinguished from internal functions, principally distribution of earnings, it has submerged its identity, its

35 Cf. note 32, supra.

36 Cf. Nims, op. cit. supra note 5, § 68; Note (1930) 30 Col.L.Rev. 695, 696.

37 Cf. notes 16 and 18, supra.

38 The term includes, in recent usage, the elements referred to in note 5, supra, and in case of incorporation, as in registration of trade-marks, reasonable opportunity initially to make use of the name in trade.

39 This, together with the deception which is foisted on the public, underlies the rule that abandonment occurs when a trade-mark is sold separately from the business. Rice-Stix Dry Goods Co. v. Schwarzenbach-Huber Co., 1918, 47 App. D.C. 249; Rockowitz Corset & Brassiere Corp. v. Madam X Co., Inc., 1928, 248 N.Y. 272, 162 N.E. 76; cf. note 47, infra. The principle has been applied to a corporate name, where the corporation has not been dissolved technically, but no longer exists for purposes of trade, and therefore has no good will. Grand Rapids Trust Co. v. Haney School Furniture Co., 1922, 221 Mich. 487, 191 N.W. 196, 27 A.L.R. 1020. But cf. Armington v. Palmer, 1898, 21 R.I. 109, 42 A. 308, 43 L.R.A. 95, 79 Am.St.Rep. 786; Metropolitan T. & T.

Co. v. Metropolitan T. & T. Co., 1913, 156 App.Div. 577, 141 N.Y.S. 598; United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 1932, 62 F.2d 881; Gold Seal Associates, Inc. v. Gold Seal Associates, Inc., D.C.S.D.N.Y. 1932, 56 F.2d 452, in all of which substantial reasons for giving relief remained, though normal business had been suspended.

40 If the corporate names are similar, but those used in trade dissimilar, as when defendant has added distinguishing matter to its name in public use, relief will be denied. Investor Pub. Co. of Mass. v. Dobinson, C.C.S.D.Cal.1897, 82 F. 56; Chickering v. Chickering & Sons, 7 Cir., 1914, 215 F. 490; Farmers' Loan & Trust Co. v. Farmers' Loan & Trust Co. of Kansas, Sup.Ct.1888, 21 Abb. N.C. 104, 1 N.Y.S. 44. Cf. also International Trust Co. v. International Loan & Trust Co., 1891, 153 Mass. 271, 26 N.E. 693; (1932) 20 Calif.L.Rev. 633, 636 n. 20, and 638 n. 33.

41 Cf. notes 6, supra, and 50, infra. It does not follow necessarily that the relief should not take the form of a qualified injunction.

good will and the distinctiveness of its corporate name in those of the combination in which, since 1922, it has lived, moved and had its being. Plaintiff would have us regard the situation as if there were three distinct enterprises, with corresponding separate good wills and corporate names. The fact is to the contrary. There are one enterprise and one good will. Corresponding to them is an identification of the corporate owners which amounts to merger in the public mind, if not in the technical law of corporate entities. Both by the terms of the working agreement and by its subjection to domination of the holding corporation, plaintiff is bound to do business, not separately and distinctively, but always in conjunction with its corporate associates.[42] Plaintiff and its associates have exchanged sole ownership of separate enterprises and corresponding individual good wills and identifications for undivided shares in a single business, good will and reputation. It is that consolidated good will, reputation and public identification which are entitled to protection from confusion by the operations of others.

It is not material that the remaining enterprise, with its good will and public identification, is owned by three corporations; or that the corporate owners retain separate identities to receive shares in the profits and distribute them among their shareholders; or that each retains its distinctive name for the nominative purposes of corporate existence and internal management. Basically this is no more than any partner or joint adventurer does. Nor does it matter that plaintiff's name remains in use as one of three in a combination of names in which the surviving enterprise conducts its business. If plaintiff's name were the sole one so employed, or perhaps the predominant or principal one used, fair trade principles might afford relief.[43] But the business is not known distinctively to the public by plaintiff's name. It occupies only a secondary position in the commonly accepted conglomerate. The dominant name[44] is that of the District Title Insurance Company. Such variation as occurs naturally emphasizes this name and correspondingly minimizes plaintiff's. Though none were dominant, the combination would not be identical with, or, in the circumstances here, confusingly similar to any one of its components separately used. By analogy to a partnership of natural persons, a firm name composed of those of the partners, as "Smith, Jones, Brown & Co.", is not identical with the individual name of the partner, Jones. The good will, the business reputation and the identification of the firm are distinct from those of the individual member.[45] So here the conglomerate uniformly designates and identifies plaintiff, not separately or independently, but always in conjunction with others.[46] Exclusive right arises only from distinctive use. Whatever plaintiff's rights might have been had it established or maintained distinctive identification in its separate name for purposes of trade, it has not

---

[42] The arrangement is no mere temporary "joint adventure" or casual cooperation in particular transactions incident to distinct and continuous courses of business conducted by each participant. It is a permanent and continuing relation, more solidly integrated than any partnership of natural persons, who may dissolve the firm at will despite contrary agreement, Lapenta v. Lettieri, 1899, 72 Conn. 377, 44 A. 730, 77 Am.St.Rep. 315; Solomon v. Hollander, 1884, 55 Mich. 256, 21 N. W. 336, responding in damages if this is done wrongfully. Plaintiff and its associates are disabled to do this by reason of the holding company's power over them.

[43] Cf. note 44, infra. The question would remain whether it could be had at the suit of plaintiff only or solely by joinder of all the owners of the business.

[44] Cf. Standard Oil Co. of New Mexico, Inc., v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973, 979–980 ("The dominant words in both names are 'Standard Oil'. Such words have acquired a secondary meaning"); Romeike v. Romeike, D.C.S.D.N.Y.1917, 7 T.M.Rep. 360, 363, reversed, 2 Cir., 1918, 251 F. 273, and comment Nims, op. cit. supra note 5, p. 255.

[45] Unless, of course, his name is used as the name of the firm. That the name of a firm is an incident of its good will is, of course, well established. Snyder Mfg. Co. v. Snyder, 1896, 54 Ohio St. 86, 43 N.E. 325, 31 L.R.A. 657; Slater v. Slater, 1903, 175 N.Y. 143, 67 N.E. 224, 61 L.R.A. 796, 96 Am.St.Rep. 605; Nims, op. cit. supra note 5, § 32.

[46] Cf. (1932) 20 Calif.L.Rev. 633, 636 n. 20. The conglomeration adds matter to plaintiff's name as distinctive as that generally supplied when injunctive relief takes the form of requiring the addition of such matter to a defendant's name. That it is plaintiff's, rather than defendant's, name which is thus made distinguishable should not be material.

done so, and to confuse such an identification with one such as has been created here is to confuse a part with the whole. The established identification, in none of its forms, is identical with defendant's name. Between the two the probability of confusion is remote. Plaintiff has abandoned the right of exclusive use of its name by conducting its business in this manner.[47]

The probability of confusion is reduced further by the experienced and discriminating character of the clientele to which defendant and the plaintiff's combination appeal,[48] and by the care defendant has taken to add distinguishing matter to its name in publicity and solicitation. Occasional misunderstanding may occur despite these precautions. But there is nothing to show probability of more than that, and in itself that does not justify the drastic relief here sought.[49] The advantage to plaintiff, except to exclude a competitor, which

[47] Possibly more of the formalistic conception of "property" remains as to abandonment than in other respects. Note (1930) 30 Col.L.Rev. 695, 697. The requirement of "intent" in addition to nonuser rests on this basis, except when nonuser represents merely a lull in operations, a period of reorganization of the business, or one in which "associative significance" remains which would make assumption by another a fraud on the public. Id. and authorities cited and discussed. As to trade names and trade-marks, the intent may be inferred from lapse of time without user, Gold Seal Associates, Inc., v. Gold Seal Associates, Inc., D.C.S.D.N.Y.1932, 56 F.2d 452, 453; Royal Baking Powder Co. v. Raymond, C.C.N.D.Ill.1895, 70 F. 376, 381, or by acquiescence, sufficiently long, with user, Beech-Nut Packing Co. v. P. Lorillard Co., 1927, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810.

In abandonment of trade names and trade-marks, ordinarily there is loss not only of the right to exclude others, but also of the prior appropriator's right to use the name in trade. But cf. Note (1930) 30 Col.L.Rev. 695, 702, as to loss merely of exclusiveness of use in cases of laches, acquiescence and unclean hands. Authority concerning abandonment of corporate names in the former sense is scarce, if not nonexistent. Generally laches and acquiescence in use by others are not effective defenses (cf. 66 A.L.R. 948, 1027–1029). But corporate names were involved in the Gold Seal Associates and Beech-Nut cases, supra, with no reference to any distinction between them and trade-marks and trade names in this respect. In the former, neither loss of associative significance nor of final opportunity to resuscitate the enterprise had occurred, hence no abandonment was found; in the latter, laches, acquiescence, etc., resulted in a ruling of abandonment of exclusive use. Whether or not the corporate grant preserves to the company the right to use its name nonexclusively for the term of corporate existence, sound reasons do not appear for distinguishing corporate names from trade names and trade-marks as to the effect of abandonment upon the exclusive function. Incorporation is no more solemn an act of appropriation or preemption than trademark registration. There are sound reasons for limiting the exclusive appropriation by incorporation (cf. Commr. Pat. 1916, quoted in note 53, infra), just as there are for doing so as to trade-marks.

In this case, strictly, abandonment is not involved. Cf. note 2, supra. But, assuming the change of name in 1922 made no substantial difference, seventeen years' nondistinctive use should be sufficient to constitute abandonment of the right to exclusive use. No issue of resumption of distinctive use by the plaintiff is presented, and no decision regarding it is made. See, further, as to abandonment, Interstate Distilleries, Inc., v. Sherwood Distilling & Distributing Co., 1937, 173 Md. 173, 195 A. 387, (1938) 22 Minn.L.Rev. 750; Mayer F. & J. Co. v. Virginia-Carolina C. Co., 1910, 35 App. D.C. 425; Levering Coffee Co. v. Merchants Coffee Co., 1912, 39 App.D.C. 151.

[48] Eastern Const. Co. v. Eastern Engineering Corp., 1927, 246 N.Y. 459, 159 N.E. 397, 399; Federal Securities Co. v. Federal Securities Corp., 1929, 129 Or. 375, 276 P. 1100, 1107, 1108, 66 A.L.R. 934; Diamond Drill Contracting Co. v. International Diamond Drill Contracting Co., 1919, 106 Wash. 72, 179 P. 120, 6 Fletcher Cyc. Corp. (Perm.Ed.) 57, notes 4 and 5; 66 A.L.R. 948, 962, and authorities cited. In Bayer Co., Inc., v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505, the decree provided different terms for sales to one market which was discriminating and to another which was not so. The relaxation of ordinarily applicable rules in cases involving banks and trust companies [cf. 6 Fletcher, supra, 57, notes 6 and 7; 66 A.L.R. 976 and 981 et seq. (loc. cit.)] appears to be founded upon the discriminating clientele theory.

[49] 6 Fletcher Cyc. Corp. (Perm.Ed.) 60–61, notes 16 and 17. Mistaken delivery of mail, 66 A.L.R. 948, 972, and authorities cited, is not sufficient. Nor is mere possibility of confusion. Federal Securities Co. v. Federal Securities Corp., 1929, 129 Or. 375, 276 P. 1100, 1103, 66 A.L.R. 934. Generally, the confusion must be

it is not entitled to do, would be slight; the detriment to defendant great.[50] Further distinguishing identification is not asked, nor does it appear to be necessary at this time.

A further reason for denying relief is that, if granted, it would restrain defendant, in effect, from competing in its name not only with plaintiff, but also with each of plaintiff's corporate associates, neither of which has any semblance of right to such protection otherwise than by virtue of its association with plaintiff. The injunction would accomplish too much. The incorporation laws were not intended to permit a single enterprise by mere incorporation to preempt three, if not four, distinct corporate names.[51] Nor is it the function of a court of equity to employ its remedies to enable such an enterprise to use each of its available names as a sword for conquering territory of competitors, and as a shield to protect its own from invasion. To do so would extend the boundaries of unfair trade beyond borders heretofore established or presently desirable.

 We have made no point of the fact that plaintiff's name appears to be composed of generic words,[52] which could not be registered as a trade-mark and which considerable authority indicates cannot be appropriated exclusively by incorporation.[53] Nor do we think it material that defendant is a foreign corporation competing with domestic ones, since the District of Columbia has no statute placing the former on a peculiar basis and we deem the case to be governed by conceptions of unfair trade, which make no distinction in this respect between domestic and foreign companies.[54]

Plaintiff's disability, if peculiar, is the result of its own peculiar action. It has had the benefit of the "working agreement". Likewise, it must accept the burdens incident to it.

Affirmed.

such as to mislead the average trader, acting with ordinary caution, Middletown Trust Co. v. Middletown Nat. Bank, 1929, 110 Conn. 13, 147 A. 22; 66 A.L.R. 948, 971 and authorities discussed; cf. (1932) 20 Calif.L.Rev. 633, 634 n. 9; but some cases protect trade with thoughtless purchasers. 6 Fletcher, supra, 54 n. 95; Patton Paint Co. v. Orr's Zinc White, Ltd., 1918, 48 App.D.C. 221 (trade-mark). But cf. 6 Fletcher, supra 54 notes 96 and 97; The Unwary Purchaser, (1910) 8 Mich.L.Rev. 613, (1919) 18 id. 75.

50 Cf. Federal Securities Co. v. Federal Securities Corp., 1929, 129 Or. 375, 276 P. 1100, 1102, 66 A.L.R. 934.

51 To the extent that the names may be established by distinctive and separate usage in trade, the rule relating to popular, shortened or nicknames [cf. 66 A.L.R. 948, 973; Pickett, Nicknames and Unfair Competition, (1935) 35 Col.L.Rev. 33] would appear to be applicable; but such usage is a different thing from the conglomerate use which has arisen here.

52 Cf. Title & Mortgage Guarantee Co. v. Louisiana Abstract & Title Guarantee Co., 1918, 143 La. 894, 79 So. 529, holding "Title Guarantee" generic.

53 The authorities are divided, the weight of authority appearing to sustain the view that such terms are not subject to exclusive appropriation by incorporation. See the authorities collected in 66 A.L.R. 948, 957 et seq.; 6 Fletcher Cyc. Corp. (Perm.Ed.) § 2427; (1932) 20 Calif.L.Rev. 633, 635 n. 11. An apparent exception is the case in which the words have acquired "secondary significance", as in Standard Oil Co. of New Mexico, Inc., v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973; Hudson Tire Co., Inc., v. Hudson Tire & Rubber Corp., D.C.S.D.N.Y.1921, 276 F. 59, 60; cf. Nims, op. cit. supra note 5, p. 251; also § 42; but the exception obviously has its foundation in the law of unfair trade.

The evidence in this case shows that the words "Lawyers Title" or "Lawyers Title Insurance" appear as parts of corporate names in numerous localities as widely separated as New York City and Seattle, Washington. Cf. American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 384, 46 S.Ct. 160, 163, 70 L.Ed. 317, in re "Simplex", quoting the Commissioner of Patents (Commr.Pat. 1916, pp. 74, 77, 79, 82–83): "It would be a serious matter if the law actually permitted any one who chose to do so to organize a series of corporations with names containing these words, respectively, and thereupon virtually withdraw these words from public use as trade-marks and monopolize them by preventing their registry as such."

54 Cf. authorities cited and discussed in 66 A.L.R. 948, 1004–1013.