**PROLIFE MINNESOTA, Respondent,**

v.

**MINNESOTA PRO–LIFE COMMITTEE, et al., Appellants.**

**No. C2–00–2160.**

Court of Appeals of Minnesota.

Aug. 7, 2001.

Review Denied Oct. 24, 2001.

Paul F. Shoemaker, Shoemaker Law Office, P.A., Minneapolis, MN, (for respondent).

Harlan M. Goulett, Harlan M. Goulett & Associates, Minneapolis, MN, (for appellants).

Considered and decided by
SCHUMACHER, Presiding Judge,
RANDALL, Judge, and G. BARRY
ANDERSON, Judge.

## OPINION

RANDALL, Judge

This is an appeal from a temporary restraining order in which the district court

enjoined appellants from using the name "Minnesota Pro–Life Committee," which is similar to the name of respondent's organization, "Prolife Minnesota." Respondent's name is protected under trademark law. Appellants contend that this violates their First–Amendment rights because they were not offered an opportunity to challenge respondent's version of the facts and law before the order was issued. We affirm and remand for a hearing for a permanent injunction.

## FACTS

Respondent Prolife Minnesota was formed in 1989 under Minnesota law. Respondent is also known as "The Billboard People." Prolife Minnesota's mission is to educate people about the pro-life message through the media and public awareness campaigns. Respondent is a 501(c)(3) organization.

Appellant Minnesota Life Committee f/k/a Minnesota Pro–Life Committee was formed in Spring 2000 by appellant Tim Commers, a former state representative. The purpose of the organization is to raise money to support candidates for political offices who support the pro-life cause. Appellants actively solicit funds through telemarketing. Respondent does not.

Respondent sought a temporary injunction and ex parte restraining order against appellants because respondent discovered that appellants were claiming association and/or identity as respondent. Respondent's principal officer, Mary Ann Kuharski, claims that she began receiving anonymous complaints by phone in May 2000, claiming "her organization" was responsible for offensive "telemarketing tactics." It is not disputed that the calls in question, wherein people being solicited for money complained about offensive tactics, came from people calling on behalf of appellants. Respondent has never used telemarketing as a means of raising money in its entire history. On May 27, 2000, Kristi Anderson, who received a telemarketing call at 6:30 a.m., filed a formal consumer complaint with the Minnesota Attorney General's Office naming "The Billboard People" as the offending organization. The complaint states that Ms. Anderson received the call from an organization calling itself "Prolife Minnesota" and "The Billboard People." Respondent also received additional phone complaints throughout the summer of 2000, which were traced to calls made by appellants to potential contributors.

In August 2000, respondent received a call from Trudy Clancy asking whether respondent was the same group that she pledged to over the phone. Kuharski claims in her affidavit that Clancy told her the organization to which she pledged money said, "Have you seen the billboards around town? Well, that's us. We're the Billboard People." She wanted to verify that she was sending her pledge to respondent because she admired the organization. After receiving a letter from appellants, which did not contain a phone number, Clancy obtained respondent's phone number from directory assistance when she asked for appellants' number. It appears that she did not realize she had been solicited by and actually pledged to appellants rather than to respondent. Later in August 2000, respondent received a similar phone call from another woman wanting to verify that it was really respondent who called her. Again, it was appellants who had actually contacted her.

Kuharski also claimed in her affidavit that at about the same time, her daughter, Christine Klaeges, received a call from appellants' representative asking for money. When she told the telemarketer that she had already given money to respondent, she was told that appellants did bill-

boards and they were affiliated with respondent. Klaeges insisted this was not correct, but the telemarketer assured her that it was affiliated.

In September 2000, Maurice Huard of Duluth sent in a $15 donation to respondent's address, which was accompanied by a tear-off sheet from "Minnesota Pro–Life Committee." Respondent called Huard to verify he intended the donation for respondent, rather than appellants. Finally, Kuharski claims that a long-time donor stopped donating to respondent after receiving a notice from respondent warning people about the confusion with appellants. The long-time donor wrote "That is it."

On August 31, 2000, Kuharski contacted Commers to learn if he knew that his telemarketers were telling people they were "The Billboard People" or affiliated with respondent and to tell him that his organization's name was similar to respondent and confusing the public. Commers claimed that that was not his intent. Kuharski learned that appellants' organization did not have an office or phone listing but merely a separate bank account for donated money.

After an exchange of letters between the parties, in which respondent asked appellants to change their name, stop claiming affiliation with respondent, and stop claiming that they are "The Billboard People," Kuharski did not feel her request was being honored. Respondent then served appellants with a summons and complaint on October 11, 2000, and filed a motion for a temporary restraining order and ex parte restraining order on October 19, 2000. The hearing took place on October 20, 2000, less than 12 hours after appellants received notice of the hearing.

At the hearing, respondent asked that appellants cease using the name "Minnesota Pro–Life Committee." Appellants agreed to this request and had in fact changed their name with the Secretary of State to "Minnesota Life Committee" before the hearing. Appellants agreed at the hearing that claiming affiliation or an association with respondent or "The Billboard People" was wrong and stated that anyone found doing so in the organization would be fired.

Based on the discussion at the hearing, the district court issued a temporary restraining order (TRO) on October 20, 2000, requiring appellants to cease and desist using the name "Minnesota Pro–Life Committee" and claiming any affiliation or association with "Prolife Minnesota" or "The Billboard People." Appellants filed an answer and counterclaim to respondent's motion on October 30, 2000, and asked the district court to dissolve the TRO and dismiss respondent's complaint in its entirety. They received no response from the district court. This appeal follows.

## ISSUE

Is the temporary restraining order against appellants an unconstitutional deprivation of their free-speech rights?

## ANALYSIS

The Minnesota Supreme Court has stated:

The granting of an injunction generally rests within the sound discretion of the [district] court, and its action will not be disturbed on appeal unless, based upon the whole record, it appears that there has been an abuse of such discretion.

*Cherne Indus., Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 91 (Minn.1979) (citation omitted).

Appellants argue that the district court's issuing a TRO against appellants is a prior restraint on their speech. Appellants contend that they should have been allowed an opportunity to submit affidavits

or briefs to challenge respondent's version of the facts and the law before the TRO was issued. Further, appellants claim that religious, political, and cultural expression should be granted an exception to trademark law even when a party's name is deceptively similar to a protected trade name.

■ A party "likely to be damaged by a deceptive trade practice of another may be granted an injunction against [the party causing the harm]." Minn.Stat. § 325D.45, subd. 1 (2000). The Minnesota Deceptive Trade Practices Act states:

A person engages in a deceptive trade practice when, in the course of business * * *, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; * * *

(5) represents that goods or services have sponsorship, approval, [or] characteristics * * * that they do not have * * *. * * *

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn.Stat. § 325D.44, subd. 1 (2000). Further, a corporate name is considered "deceptively similar" to the name of another business

only if the similarity tends to deceive the ordinary purchaser as to the true identity of the goods whereby he is led to believe that he is getting [respondent's] product when he is in fact getting that of [appellants].

Howards Clothes, Inc. v. Howard Clothes Corp., 236 Minn. 291, 295–96, 52 N.W.2d 753, 757 (1952) (citations omitted). Trademark law's purpose

is to protect the public from confusion regarding the sources of goods or services and protect business from diversion of trade through misrepresentation or appropriation of another's goodwill.

Minneapple Co. v. Normandin, 338 N.W.2d 18, 22 (Minn.1983) (citation omitted). "Goodwill" relates to a business's credibility and reputation for fair dealing and integrity. Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp., 109 F.2d 35, 38 n. 5, 43 n. 38 (D.C.Cir.1939), cert. denied, 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1028 (1940).

A TRO may be granted without written or oral notice to the adverse party only if

(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party * * * can be heard in opposition, and (2) the applicant's attorney states to the court in writing the efforts, if any, which have been made to give notice or the reasons supporting the claim that notice should not be required.

Minn. R. Civ. P. 65.01.

Appellants do not argue that their name is dissimilar from respondent's. They concede that point. Rather, appellants argue that they can use a name similar to respondent even though the public could be confused, claiming that there should be an exception to trademark law for religious, political, and cultural expression. Appellants do agree that the First Amendment does not shield a religious or political fundraiser from "impersonating" another person or entity to collect funds for the same cause. While appellants claim they changed their name to Minnesota Life

Committee to minimize any risk of future liability, they reserved the right to argue that legally they did not have to change it. Thus, the issue is not moot.

Respondent makes it very clear that it is not claiming a proprietary interest in the words "pro-life" or "Minnesota." Respondents argue, instead, that using a combination of these words in a manner that is *deceptively* similar to its name is a trademark infringement. Respondent provided some examples of ways appellants could use pro-life words in their name without infringing on respondent's trade name such as, "Minnesota Committee for the Election of Pro–Life Candidates," or the "Committee for Election of Minnesota Pro–Life Politicians." In addition, respondent is not attempting to censure or exercise prior restraint over any of appellants' messages, except for appellants' claim of affiliation or association with "Prolife Minnesota" and "The Billboard People." That point is not in dispute. Appellants concede that any such claim of affiliation by them with respondent would be improper.

Respondent claims that it is merely protecting the name "Prolife Minnesota," which has state and federal trademark protection, and "The Billboard People," which has state trademark protection and is in the process of being registered nationally.

Appellants argue that their speech is subject to protection under a strict-scrutiny analysis because it is political speech, rather than commercial speech. They argue that the restriction is based on the content of their name. Respondent argues that the issue is commercial speech and, thus, less scrutiny is required.

■ Content-based restrictions on speech survive First Amendment strict-scrutiny analysis only if they are necessary to serve a compelling state interest and

are narrowly drawn to achieve that end. *Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). Even assuming this case calls for strict scrutiny, the TRO is valid. The state has a compelling interest in protecting property interests in trade names. *Cf. College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 673, 119 S.Ct. 2219, 2224, 144 L.Ed.2d 605 (1999) (stating trademarks are a constitutionally protected property interest). Further, the restriction on appellants' speech is narrowly tailored so that it only impacts the use of appellants' admittedly deceptively similar name.

■■ This matter was not decided on its merits; it was a TRO. "The function of a [TRO] * * * is to preserve the status quo until opportunity is afforded to decide the matter on the merits." *Crosby v. Crosby,* 587 N.W.2d 292, 297 (Minn.App. 1998) (citation omitted), *review denied* (Minn. Feb. 18, 1999). Even though appellants received late notice of the TRO hearing, a review of the record and the supporting affidavit by Kuharski show that respondent suffered irreparable injury to its credibility and reputation and would continue to do so if appellants did not stop using the name "Minnesota Pro-life Committee" and claiming they were affiliated or associated with respondent. Respondent experienced numerous incidents where people mistook appellants as respondent. Appellants' telemarketers repeatedly claimed affiliation or association with "Prolife Minnesota" and "The Billboard People," which prompted several people, some of them long-time contributors to respondent, to contact respondent to complain about what they believed to be respondent's telemarketing tactics. Respondent also received a formal complaint from the attorney general's office for actions performed by appellants. All of

these incidents show that the public confused appellants with respondent and are evidence of irreparable injury or damage to respondent. Based on the evidence before the district court, the court did not err in granting respondent the TRO.

The parties at oral argument before this court conceded there was no firm settlement between them before the district court ruled. Therefore, it was proper for the district court to file a written order.

After issuing the TRO, which we affirm today, the district court did not set a date for a hearing for a permanent injunction. Appellants request a final hearing and respondent agrees that appellants are entitled to one. We agree. Both parties should be given a reasonable time to prepare for the hearing, and one should be scheduled at the earliest practical time.

### DECISION

The district court acted properly in granting a TRO in favor of respondent. The record contains concrete evidence of significant confusion to people who were solicited by appellants for funds, and clear evidence of ongoing harm to respondent.

The record is clear that many individuals considered the two organizations to be one and the same; there is evidence in the record that telemarketers calling on behalf of appellants did nothing to discourage the confusion.

The district court properly found that respondent met its burden of proof when asking for a TRO. Having said that, appellants are entitled to a hearing on whether a permanent injunction should be issued.

**Affirmed and remanded.**