### Churchill Downs Distilling Co. v. Churchill Downs, Inc.
(Decided Feb. 11, 1936.)

LAWRENCE S. GRAUMAN for appellant.
CARROLL & McELWAIN for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—
Affirming.

In 1933, B. J. Frentz and his associates, decided to engage in the whisky business. To do so, they organized under the law of this commonwealth a corporation and named it Churchill Downs Distilling Company. No one interested in, or connected with, the corporation was of the name of Churchill or Downs. The corporation's plant was located in Nelson county, Ky., about thirty miles from the place of business of Churchill Downs, Inc., Louisville, Ky. Thereat, it beban to purchase, bottle, label, and market whisky, and endeavored especially to market it in Louisville. Its output in bottles was labeled "Churchill Downs Brand, Straight Kentucky Bourbon Whiskey, Bottled by Churchill Downs Distilling Company, Incorporated, Louisville, Kentucky." On this label the name "Churchill Downs" was printed in bold letters, with a facsimile of a grandstand easily identified as the grandstand located at the racing plant of Churchill Downs, Inc.; in front of the grandstand, on the label, was a race track with horses and jockeys engaged in a race thereon.

It is agreed that Churchill Downs Distilling Company and Churchill Downs, Inc., are engaged in entirely different lines of business—they are not competing corporations—and there is no relation whatever in the products manufactured and sold by the former with the character of business conducted by the latter.

This action was brought by Churchill Downs, Inc., against the Churchill Downs Distilling Company for injunctive relief.

The trial court enjoined it from further bottling whisky under the label carrying the word "Downs," in conjunction with the name "Churchill," excepting whisky bottled, labeled, and on hand ready for sale and distribution, and after July 1, 1936, to cease to use the word "Downs" with the name "Churchill" as a part of its corporate name.

The Churchill Downs Distilling Company is before us insisting that injunctive relief should be denied Churchill Downs Inc. Its insistence, accurately and succinctly stated, is:

> "There is no actual market competition of the products of the corporations; there must be competition of some sort in order to make out a case of unfair competition and in the absence of competition, the doctrine sought by Churchill Downs, Inc., cannot be invoked."

To sustain this statement of principles, it cites to us Regent Shoe Mfg. Co. v. Haaker, 75 Neb. 426, 106 N. W. 595, 4 L. R. A. (N. S.) 447; National Grocery Co. v. National Stores Corp, 95 N. J. Eq. 588; 123 A. 740; Nims on Unfair Competition and Trademarks (2 Ed.) 1917, sec. 374, page 658; Raladam Co. v. Federal Trade Comm., 42 F. (2d) 430 (C. C. A. 6th Circuit); Federal Trade Comm. v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838; Blue Goose Auto Service v. Blue Goose Super Service Station, 110 N. J. Eq. 438, 160 A. 836; Beech-Nut Packing Co. v. P. Lorrilard Co. (C. C. A.) 7 F. (2d) 967, affirming (D. C.) 299 F. 834; Bortwith v. Evening Post, 37 Ch. D. 449; Carroll et al. v. Duluth Superior Milling Co., 232 F. 675 (C. C. A. 8th Circuit); Pittsburgh Brewing Co. v. Ruben, 55 App. D. C. 171, 3 F. (2d) 342; Ely Norris Safe Co. v. Mosler Safe Co. (C. C. A.) 62 F. (2d) 524; Charles

Broadway Rouss, Inc. v. Winchester Co. (C. C. A.) 300 F. 706, certiorari denied 266 U. S. 607, 45 S. Ct. 92, 69 L. Ed. 465; Carney Hospital v. McDonald, 227 Mass. 231, 116 N. E. 414. The above cases recognize and apply to the facts therein, the principles for which the distilling company now contends.

Another insistence is that it is not selling any goods of related character to the business conducted by Churchill Downs, Inc., and there not being any actual market competition between its products and the business of Churchill Downs, Inc., "there is not any unfair competition." In support of this statement it especially relies on Borden Ice Cream Co. et al. v. Borden's Condensed Milk Co., 201 F. 510, 121 C. C. A. 200.

In the cases cited and relied on by Churchill Downs Distilling Company, the rule is stated:

> "There must be a real, present, or prospective competition; that is, an endeavor to get the same trade from the same people at the same time, and that endeavor must on the defendant's part be unfair."

From this premise it argues the proof shows there will be no further use of the label complained of by reason of the fact that Churchill Downs Distilling Company is now confining its business to the manufacture of whisky and selling the same in barrels.

It is true that the term "unfair competition" presupposes competition of some kind. And, "the doctrine is usually invoked when there is an actual market competition between the analogous products of a plaintiff and a defendant and so it has been natural enough to speak of it as the doctrine of unfair competition." 63 C. J. sec. 100, p. 389; Colorado Nat. Co. v. Colorado Nat. Bank of Denver, 95 Colo. 386, 36 P. (2d) 454, 455. See cases, supra, cited by the distilling company.

Also, in the past, courts in other jurisdictions have frequently refused to enjoin the use of a similar corporate name because there was no market competition, in the absence of proof of special damages. See Annotation 66 A. L. R. 964, and Corning Glass Works v. Corning Cut Glass Co., 197 N. Y. 173, 90 N. E. 449; Borden Ice Cream Co. v. Borden's Condensed Milk

Co., 201 F. 510, 121 C. C. A. 200, reversing (D. C.) 194 F. 554, and other cases above cited by Churchill Downs Distilling Company.

But the tendency of the courts has been and is to widen the scope of protection in unfair competition, and to hold that it is not confined to actual market competition. This turn of the decisions is exemplified by the cases of Standard Oil Co. of New Mexico, Inc. v. Standard Oil Co. of California (C. C. A.) 56 F. (2d) 973, 977; Colorado Nat. Co. v. Colorado Nat. Bank of Denver, supra; Wisconsin Elec. Co. v. Dumore Co. (C. C. A.) 35 F. (2d) 555.

The court, in Colorado Nat. Co. v. Colorado Nat. Bank of Denver, quoting from Standard Oil Co. of New Mexico, Inc. v. Standard Oil Co. of California, admirably stated the present trend of the courts, in these words

"There was a time in the history of the law of unfair competition when it was a debatable question whether a merchant's good-will indicated by his trade name or trade mark extended beyond such goods as he sold (Yale Elec. Corp. v. Robertson [C. C. A. 2] 26 F. [2d] 972, 973), but it is now well settled that the law of unfair competition is not confined to cases of actual market competition. If one fraudulently sells his goods or his services or his securities as those of another, injury may re-result to the latter although he is not engaged in the manufacture or sale of like goods. Where one passes off his goods, his services, or his business as the goods, services, or business of another, equity will intervene to protect the good-will and business reputation of the latter from any injury liable to be caused thereby. See cases note i. Indeed, the right to protection against the unlawful or unfair use of a corporate name extends to all corporations of whatever nature, including corporations not organized for pecuniary profit."

Vogue Co. v. Thompson-Hudson Co., 300 F. 509, 512 (C. C. A. 6); Kellogg Toasted Corn Flake Co. v. Quaker Oats Co. (C. C. A.) 235 F. 657, 664; Wall v. Rolls-Royce of America (C. C. A.) 4, F. (2d) 333, 334.

The testimony of Frentz, itself, brings this case

within the ambit of this principle. His testimony upon which the distilling company mostly relies, establishes that its organizers and incorporators used the words. "Churchill Downs," "because it was a name that was. known in Kentucky," and they "hoped that the use of this name would help extend its sales." The beginning of the use of the name "Churchill Downs" in that of the corporation was without the knowledge and. consent of Churchill Downs, Inc. There was no connection whatsoever between the two corporations or those interested therein. The label on its bottles containing a facsimile of the grandstand of Churchill Downs, Inc., a race track with horses and jockeys engaged in racing thereon, and newspaper advertisements, corroborate the testimony of Frentz in which he substantially admits that the words "Churchill Downs" was used in. the name of his corporation with the intent and purpose of his corporation deriving a profit in the sale of its products, from the reputation and renown of Churchill Downs, Inc. It was not necessary for it to show that any one had actually been misled by similarity in names. It was sufficient that its use of the name "Churchill Downs" was likely to produce deception. Newport Sand Bank Co. v. Monarch Sand Mining Co., 144 Ky. 7, 137 S. W. 784, 34 L. R. A. (N. S.) 1040.

Churchill Downs Distilling Company, with confidence amounting to faith, relies on the case of Borden. Ice Cream Co. v. Borden's Condensed Milk Co. (C. C. A.) 210 F. 510. In Finchley's Inc. v. Finchley Company, Inc., (D. C.) 40 F. (2d) 736, the court, in prefacing its discussion of the Borden Case, said:

> "In owning a mark which enjoys such trust and. confidence in relation to one article or place, the owner possesses valuable property in the right to use that familiar and popular mark, or name. * * * He owns a right to use the popularity of that mark. or name or object for his profit, and to prevent. its use by others to his detriment. * * * As the court views the decisions this is undoubtedly their trend, whatever may appear to have been said to the contrary in such cases as Borden Ice Cream. Co. v. Borden's Condensed Milk Co. (C. C. A.) 201 F. 510, and similar cases."

The Borden Case was also considered in Stan-

dard Oil Co. of New Mexico, Inc. v. Standard Oil Co. of Calif., supra, where the court said:

> "Recent, well considered cases upon the law of unfair competition have expanded the narrow rule announced in the Borden Case to an extent that leads us to conclude that the Borden Case is out of harmony with the modern law of unfair competition."

We concur in this view of the Borden Case.

The evidence plenteously establishes that its use of this name actually had an effect on the public to the prejudice of the reputation of Churchill Downs, Inc. Its mail was delivered to the office of Churchill Downs, Inc.; accounts against it were presented at the office of the latter for payment, and shipments of freight directed to it were regarded by the employees of the carrier as consigned to Churchill Downs, Inc.

Louisville always has been a great racing center, commencing in 1839. In 1875, Colonel M. Lewis Clark was a spectator at the annual running of the English Derby, at Downs, England. Previously, and at that time, he was interested in promoting thoroughbred racing in this state. He acquired from his uncles, John H. and Hugh Churchill, a tract of land then beyond the limits of the city of Louisville. On it, he and his associates constructed buildings, customarily connected with race tracks, and a race track. They named the racing plant Churchill Downs. In the year 1875, at the racing plant, they inaugurated the Kentucky Derby, which was modeled in general outlines after the English Derby at Downs. Continuously since that date, the soil of Churchill Downs has been a field of honor of the winners of the Kentucky Derby. Chivalry springs from the handsome, polished horse. The Kentucky Derby exemplifies Kentucky chivalry. That story began in 1775, when the first law-making body of Kentucky met, and "on motion of Daniel Boone, leave was given to bring in a bill for improving the breed of horses." It was reactivated when Laurel and Rhododendron were the thoroughbreds of the Blue Grass, and was finished in the Kentucky Derby. The Kentucky Derby is a true reflection—directly from the first derby at Epsom Downs. For the Kentuckian it sums up all the history of his forbears, their nativity and horses. To it, an-

nually, pilgrimages are made from distant shores. The elite, the middle-class, the captains of industry with the occupants of cabins, from every section of our country, attend it, yet in them thereat is the democracy of peers. From the world's viewpoint, the Kentucky Derby at Churchill Downs and the English Derby at Downs are the outstanding events of the turf, not so much in comparison, for all turf events are interrelated, but because of their significance. The celebrity of the Kentucky Derby is in every country. Each year the royal blood of the world's turf competes thereat. It is never over, for it sums up daily, "the lives and fortunes of all the gallant horses, all the indefatigable labor of breeders, trainers, the skill of jockeys, the car of revenues." The name "Churchill Downs" is inextricably interlaced with the origin, history, and fame of the Kentucky Derby. Indeed, in the esteem of the general public, they are sysonyms—signifying the classic home of only cultured racers.

The right of Churchill Downs, Inc., to the exclusive use of the name "Churchill Downs" is property in a qualified sense (Stratton & Terstegge Co. v. Stiglitz Furnace Co., 258 Ky. 678, 81 S. W. [2d] 1), which equity by injunctive relief will protect from another's intentional use for the purpose of deriving a profit from its reputation, without proof of special damages. Armstrong v. Kleinhans, 1 Ky. Law Rep. 112.

It was not incumbent upon Churchill Downs, Inc. to prove a fraudulent intent of the distilling company. As was said in Driverless Car Co. v. Glessner-Thornberry Driverless Car Co., 83 Colo. 262, 264 P. 653, 654:

"The same relief in equity that is given to prevent improper use of a trade-name is given for unfair competition, and the same kind of relief is afforded to prevent improper use of a corporate name. Fraudulent intent need not be shown in either kind of case where the necessary or probable effect or tendency of a defendant's conduct is to deceive the public and pass off his goods or business as and for that of the plaintiff, especially where the preventative relief sought is against continuance of such conduct."

38 Cyc. 783 et seq.

It further relies upon an affirmative defense to

the effect tha|t the name "Churchill Downs" has been used or registered by others a number of times. Therefore, it argues the same may be used by it for a different product. To sustain this statement it cites Pabst Brewing Co. v. Decatur Brewing Co., 284 F. 110 (C. C. A. 7th Circuit). Its evidence establishes that the name "Churchill Downs" has been used by persons and companies other than Churchill Downs, Inc., in an entirely different business from that of Churchill Downs distilling Company and of Churchill Downs, Inc.; that Levy Brothers engaged in business at Third and Market streets, Louisville, Ky., advertised and sold "Churchill Downs" hats; "Churchill Downs Post" No. 2921, at Fourth and "M" streets, Louisville, Ky., sold tickets for a "Bingo;" the General Tobacco Company registered with the United States Patent Office in 1922, the name "Churchill Downs" for cigars, smoking tobacco and leaf tobacco; Levy Brothers registered with the United States Patent Office the name "Churchill Downs" for women's, men's and children's hats and caps; Abercrombie & Fitch Company, Forty-Fifth and Madison streets, New York City, registered with the United States Patent Office the name "Churchill Downs" for walking-stick seats, canes, parasols, and umbrellas; and it is clearly established that the public had not been induced to buy the goods of the Churchill Downs Distilling Company under the belief they were manufactured by Churchill Downs, Inc.

The use of the name "Churchill Downs" by other persons or corporations is no shielding defense to the distilling company's use of it. See Standard Oil Co. of Maine v. Standard Oil Co. of New Yerk (C. C. A.) 45 F. (2d) 309; Atlas Assur. Co. v. Atlas Ins. Co., 138 Iowa, 228, 235, 112 N. W. 232, 114 N. W. 609, 15 L. R. A. (N. S.) 625, 128 Am. St. Rep. 189; Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 F. 94; State ex rel. Cohen v. Hinkle, 139 Wash. 651, 247 P. 1029.

The pending case does not involve unfair competition in the sale of goods, but the unfair appropriation of a business, a corporate, name—a species of property—with the intent to profit in the sale of goods not related in character to the business conducted by Churchill Downs, Inc., by the means of the ingenious use of a corporate name and the advertisements of its products, to deceive the public and to induce it to regard the distilling company's products, debts, freight

shipments, and mail as those of Churchill Downs, Inc., which clearly entitled it to injunctive relief.

The judgment of the chancellor being in harmony with our views, it is affirmed.