COLSTON INVESTMENT COMPANY and Colston Commercial Properties, Inc., Appellants/Cross–Appellees,

v.

HOME SUPPLY COMPANY, Appellee/Cross–Appellant.

Nos. 1999–CA–000491–MR, 1999–CA–000560–MR.

Court of Appeals of Kentucky.

June 22, 2001.

Discretionary Review Denied by Supreme Court June 5, 2002.

15. Ky.App., 760 S.W.2d 102 (1988).

Bridget Papalia, Christopher S. Burnside, Brown, Todd & Heyburn, Louisville, KY, for Appellants/Cross–Appellees.

W. David Kiser, Robert L. Ackerson, Ackerson, Mosley & Yann, Louisville, KY, for Appellee/Cross–Appellant.

Before BARBER, COMBS, and McANULTY, Judges.

## OPINION

BARBER, Judge:

· Appellants, Colston Investment Company and Colston Commercial Properties, Inc., d/b/a Executive Studios & More ("Colston"), are the defendants to an action for trademark infringement and unfair competition. Appellee, Home Supply Company ("Home") operates two hotels in Louisville on Phillips Lane next to the fairgrounds—the Executive Inn, opened in 1963, and the Executive West, opened in 1972. In 1994, Colston opened a facility, Executive Studios & More, on Brownsboro Road, in Louisville; in 1997, Colston opened a second Executive Studios & More on Gaulbert Avenue, in Louisville.

On September 22, 1997, Home filed an action in Jefferson Circuit Court against Colston alleging trademark infringement and unfair competition. Following a trial on the merits, the circuit court held that the word, "executive," had acquired a secondary meaning in the metropolitan Louisville area through its long exclusive use in connection with Home's hotels, and that Home had produced evidence that the use of the word in Colston's facilities had created actual confusion in the public's mind.

The court did not order Colston to discontinue the use of the word, "executive"; however, it did order Colston to add a disclaimer, "Not affiliated with Executive Inn or Executive West" to its signage and local and national advertising materials for the Gaulbert Avenue location, alone. Colston's CR 65.08 motion for a stay of permanent injunction pending appeal was granted by order of this Court entered May 17, 1999.

■ Colston raises several issues on appeal. The first is whether Home is judicially estopped from claiming trademark protection, having maintained that the word, "executive," was not "distinctive" in

prior litigation. Home explains that in 1967, a dispute arose between it and the Executive Inn Corporation which managed the hotel. In its answer to the lawsuit, Home raised defenses challenging the management corporation's right to claim exclusive use of the word, "executive." That case was settled.

The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. [Citations omitted.]

. . . .

The "prior success" requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits ... judicial acceptance means only that the first court has adopted the position urged by the party.... When an ordinary civil case is settled, there is no "judicial acceptance" of anyone's position and thus there can be no judicial estoppel in a later proceeding.

*Reynolds v. Commissioner,* 861 F.2d 469, 472–73 (6th Cir.1988). The prior case having been settled, there can be no judicial estoppel in this proceeding.

■ Colston also argues "executive" is not distinctive and was not shown to be distinctive. In his treatise, J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition,* § 11.01 explains the spectrum of distinctiveness of marks. There are two basic categories into which all candidates for trademark status must be placed: inherently distinctive or inherently nondistinctive. There are four subcategories of terms: (a) Generic (which can never be trademarks), (b) Descriptive, (c) Suggestive and (4) Arbitrary or Fanciful. *Id.* at § 11.01[1].

■■■■ By definition, inherently distinctive words need no proof of distinctiveness. Arbitrary or fanciful terms and suggestive terms are viewed as being inherently distinctive. Descriptive terms are not inherently distinctive. *Id.* at § 15.01[1]. "If a given symbol or word is *not* inherently distinctive, it can be ... protected as a mark only upon proof that *it has become distinctive*. This acquisition of distinctiveness is referred to as 'secondary meaning.' " *Id.* (Emphasis original.) "Descriptive terms are not protectable absent a showing of secondary meaning, *i.e.,* distinctiveness." *Ashland Oil v. Olymco, Inc.,* 905 F.Supp. 409, 412 (W.D.Ky.1994).

> The "secondary meaning" of a trade-name or mark may be localized. [Citation omitted.] A newcomer in the field has no right to use another's distinctive trade-name or designation which, though it be unavailable for exclusive use, has become locally associated with an established business and its use would result in filching or infringing upon his neighboring competitor's good will; nor may he thereby commit a fraud upon him by leading the public to believe, not that he is his neighbor's keeper, but is the neighbor himself. Time is not the exclusive standard in determining whether or not a secondary meaning has been acquired. [Citation omitted.]

*U–Drive–It Co. v. Wright & Taylor,* 270 Ky. 610, 110 S.W.2d 449, 453 (1937).

In its November 16, 1998 Opinion and Order, the trial court found that:

> The word, "Executive," ... was shown by the evidence at trial to be a common descriptive term as used in the hotel/lodging industry to describe the room or services offered to be above average. [Home's general manager] ... testified that the word "Executive" in the hotel industry means higher than average service or a cut above. [The manager of Executive Inn] ... testified that "Executive" is a common term in the hotel industry as a type of room. Colston testified that "Executive" in the hotel industry means better than run of the mill. ...

■■■■ "In all actions tried upon the facts without a jury, the court shall find the facts specifically. ... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. The trial court's categorization of "executive" as a descriptive term is amply supported by the evidence and is not clearly erroneous.

Colston also contends that the trial court erred in concluding that "executive" had acquired secondary meaning, because it did not find that "executive" was distinctive. We are perplexed rather than persuaded by Colston's position. The trial court noted that "executive" is common to both parties' trade names, and that infringement or unfair competition may result from the use of only part of a trade name. 74 Am.Jur.2d *Trademarks and Tradenames* § 104 (1974). The court held:

> The doctrine of secondary meaning applies where a name or mark has become associated in the public's mind with a certain business or entity and is protectable in that business' or entity's market area. See *Jackson v. Stephens,* Ky., 391 S.W.2d 702 (1965); 74 Am.Jur.2d *Trademarks and Tradenames* § 64.
>
> ....
>
> Where a descriptive name has acquired a secondary meaning by long use in connection with the business of a particular trader so as to be understood by the public as designating that trader's business, a deceptive use of such name by other in connection with a similar

business constitutes unfair competition. [*Jackson*] *Id.* at 705.

. . . .

[T]estimony from Luersen [Home's general manager] and Colston shows that during the last twenty-five years, Executive Inn and Executive West were the only ones in the hotel/lodging industry (except Colston Co.) using the word "Executive" in its trade name in the metropolitan Louisville area. Executive Inn and Executive West have spent (primarily locally) approximately three million dollars in hard advertising over the years to get their names out. . . . Plaintiff's Exhibit 13 shows the cost of advertising for both hotels, for the period April 1, 1997 to March 31, 1998, to be $148,558.34.

The evidence, including testimony from Luersen and Oetken [Executive Inn's hotel manager], supports the conclusion that Executive Inn and Executive West have a good solid reputation in the metropolitan Louisville area, based upon advertising, sales, training and service. . . . Thus, the Court finds that the descriptive word "Executive" has acquired a secondary meaning in the metropolitan Louisville area so as to have become distinctive of Executive Inn or Executive West, based upon the twenty-five years of exclusivity in its name locally in the hotel/lodging industry and the nature and extent of advertising such trade name.

■■■■ Secondary meaning is a question of fact. *Burnside Veneer Corp. v. New Burnside Veneer Co.*, Ky., 247 S.W.2d 524 (1952). Evidence of secondary meaning may be direct or circumstantial.

[C]ourts are allowed to draw inferences of secondary meaning from evidence of the following: long-term usage of the mark, effort and expenditures of money put toward developing a reputation and good will associated with the mark, history of sales volume of the affected product or services, and advertising expenses and other marketing costs attributable to developing consumer recognition of the mark with a single source.

*Ashland Oil, supra* at 413. The trial court's finding of secondary meaning is well supported by the evidence and cannot be disturbed on appeal. CR 52.02.

■■■■ Colston also argues that the trial court erred in admitting evidence of "wrong number" phone calls. "[A]buse of discretion is the proper standard of review of a trial court's evidentiary rulings." *The Goodyear Tire & Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575, 577 (2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581.

By order entered June 29, 1998, the trial court denied Colston's motion in limine:

Colston filed a motion in limine to exclude … all evidence relating to the phone calls documented by Home Supply's employees to show actual confusion of the public.

. . . .

KRE 803(3) is the "state of mind" exception to the hearsay rule. It provides that a statement of the declarant's then existing state of mind is not excluded by the hearsay rule.

Home Supply cites to numerous federal cases which hold that testimony from employees regarding conversations with confused individuals is admissible to reflect their existing state of mind. Based upon this persuasive federal authority … [e.g., *Programmed Tax Systems, Inc. v. Raytheon Company,* 439 F.Supp. 1128 (S.D.N.Y.1977); *Imperial Service Systems, Inc. v. ISS International Service System, Inc.,* 701 F.Supp. 655

(N.D.Ill.1988)], the Court finds KRE 803(3) to be applicable in this case as their confusion would be the then existing state of mind of the declarants (the telephone callers).

Lastly, Colston argues that the [subject] evidence ... is more prejudicial than probative. Under KRS 403, a court may exclude relevant evidence whose probative value is substantially outweighed by danger of undue prejudice.

While such arguments may have some validity, they go to the weight to be given Home Supply's evidence of public confusion and not its admissibility.

Colston argues that the evidence should have been excluded as hearsay, misconstruing *Programmed Tax Systems, supra* as a case "on point":

> [C]itations of statements ... by others, insofar as they are offered for the truth of the matter asserted therein, are clearly hearsay and thus inadmissible **unless they come within an exception to the hearsay rule.** Fed.R.Evid. 801–02. **Such an exception is available for the statements of those "declarants" who were describing ... their "then existing state of mind,"** *i.e.,* **their confusion.** *Id.* 803(3). (Emphasis added.)

*Id.* at 1131, n. 1. We note that McCarthy includes *Programmed Tax Systems* among numerous authorities holding that testimony of misdirected letters, phone calls, and the like *is* admissible because it is not hearsay (not offered to prove the truth of any customer's assertion), or because it falls within an exception to the hearsay rule. McCarthy, *supra* at § 23.02[2][c], footnote 23. We find no abuse of discretion and affirm the trial court's denial of Colston's motion in limine.

■■■ Colston appears to be under the mistaken impression that the evidence of wrong numbers was the sole basis for the trial court's conclusion of confusion and infringement. To the contrary, the trial court concluded that there was a "substantial likelihood of public confusion" based upon several factors—Home's exclusive use of "executive" for 25 years in metropolitan Louisville, Colston's competition for overnight guests, its advertising of similar package deals, and the fact that the parties advertised through some of the same channels—*in addition to* the testimony regarding wrong numbers. "The test of infringement is the *likelihood* of confusion, not the proof of *actual* confusion. The plaintiff is not required to prove any instances of actual confusion." *Id.* at § 23.02[1], noting *Churchill Downs Distilling Co. v. Churchill Downs, Inc.* 262 Ky. 567, 90 S.W.2d 1041 (1936).

■■■ Colston also contends it was error to grant injunctive relief, absent intent to deceive. Colston asserts that Home had to establish that Colston intentionally palmed off its lodging facilities as Home's and through that deception diverted patrons to itself. We disagree with Colston's analysis. McCarthy discusses the semantic confusion surrounding the term, "palming off:"

> The term "palming off" and its synonym, "passing off" are often loosely used in judicial opinions and lawyers' briefs. Sometimes these terms are used to mean one thing and another time something else. The terms "palming off" or "passing off" have been used by various courts to refer to at least three different and distinct situations: (1) substitution of one brand of goods when another brand is ordered; (2) trademark infringement where the infringer intentionally meant to defraud and confuse buyers; and, (3) trademark infringement where there is no proof of fraudulent intent, but there is a likelihood of confusion of buyers.

Part of the ... confusion can be found in the ... development of unfair competition law ... [when] early nineteenth century ... common law developed as an offshoot of the tort of fraud and deceit and called it "palming [or passing] off"....

....

**Most courts today adopt the test of "likelihood of confusion" as the measure of trademark infringement rather than the more narrow concept of fraudulent "passing off." In modern law, the necessity for any "wrongful intent" on the infringer's part has become totally unnecessary for a court to find trademark infringement or unfair competition.** (Emphasis added.)

*Id.* at § 25.01(1).

Colston relies upon *Covington Inn Corp. v. White Horse Tavern, Inc.*, Ky., 445 S.W.2d 135 (1969). There, the court held that the White Horse Tavern may have suffered inconvenience, but had not established sufficient confusion to support a claim of unfair competition against the White House Inn, a motel and restaurant.

*White Horse* appears to have generated its own brand of confusion. *White Horse* quotes *Kay Jewelry Co. v. Gay's Jewelry, Inc.*, Ky., 277 S.W.2d 30 (1955) holding that intent to deceive is the gravamen of the offense and that "greater consideration" should be given to the intent with which the name is used.

*Kay Jewelry* differs from *White Horse*, in that the name sought to be used was the name of a *person*. Each party sought to justify the use of the names involved as legitimately based upon the name of a person in the family or in the business. The "Gay" in Gay's jewelry was the owner's niece. The court explained that it was well settled a family surname is incapable of exclusive appropriation in trade. The court also noted authority upholding the

right to use one's first name on the same principle. The court, *in that context,* discussed that the more important consideration is the intent with which a person's name is used, rather than whether it originates from a first or last name of the owner or someone connected with his family or business.

*Kay Jewelry,* at 33, states:

It is necessary to show that there is an intent to deceive on the part of the offender, **or** that there is a **likelihood that the buying public will be** deceived or **confused by conduct on the part of the alleged offender from which such intent may be reasonably inferred.** (Emphasis added.)

Here, the trial court concluded Home had shown a substantial likelihood of public confusion. There was no error.

 Colston argues that it was error to require a disclaimer on national advertising where only the Gaulbert Avenue location was the subject of the injunction. The logic of this argument is illusory. "There is no doubt that in cases of unfair competition and trademark infringement, a court has the power to require a defendant to take affirmative steps to distinguish its products so as to indicate their real source to the public." *McCarthy, supra* at § 30.04[1]. A state court has the power to enjoin activities outside the state. *Id.* at § 30.09[2]. The trial court found that Colston competed for overnight guests, that the parties advertised similar package deals, and that they advertised through some of the same channels locally and *nationally.* The injunction covered the market where the defendant advertised its facility. We find no error.

 The trial court found that "any likelihood of public confusion can be remedied" by placing the subject disclaimer on any future advertising or marketing and by adding it to the exterior sign on

Gaulbert Avenue. Home challenges this on cross-appeal, theorizing that the disclaimer is an ineffective remedy where the likelihood of confusion is substantial. Home argues that the trial court should have ordered Colston to discontinue using "executive" in its name.

In *King Bearings v. King,* 882 F.Supp. 630 (W.D.Ky.1994), the District Court ordered the use of a disclaimer, having found that there was a likelihood of confusion in the metropolitan Louisville/southern Indiana area. The court noted that disclaimers had been held to be an adequate remedy when sufficient to "avoid substantially" the risk of consumer confusion. *Id.* at 636.

■■■■ "[I]njunctive relief is basically addressed to the sound discretion of the trial court. Unless a trial court has abused that discretion, this Court has no power to set aside the order below." *Maupin v. Stansbury,* Ky.App., 575 S.W.2d 695, 697–698 (1978). Here, the evidence does not require a finding that the disclaimer is insufficient to substantially avoid the risk of consumer confusion. We find no abuse of discretion.

The trial court found that Home did not challenge Colston's use of "executive" until Spring 1997, after the Gaulbert Avenue location was being built. Colston raised laches as a defense because Brownsboro Road had been operating for two and one half years without complaint. The court concluded that Home's objection in the Spring of 1997 constituted unreasonable delay to Colston's disadvantage, Colston having spent over 7 million dollars in new building costs alone, after using the trade name on Brownsboro Road since 1994. That did not take into account advertising costs or the client base Colston had built over the years. The court held that laches precluded an award of damages to Home for past infringement or unfair competition.

On cross-appeal, Home contends this was error. Home contends there is a presumption that a delay is reasonable, where the statute of limitations has yet not run, relying upon *Tandy Corporation v. Malone & Hyde, Inc.,* 769 F.2d 362 (6th Cir. 1985). Home's reliance on *Tandy* is misplaced. *Tandy* is a Lanham Act Case for federal trademark infringement:

> **The Lanham Act does not contain a statute of limitations. In determining when a plaintiff's suit should be barred under the [Lanham] Act, courts have consistently used principles of laches** .... [Citations omitted.] [Thus,] the statute of limitations applicable to analogous actions at law is used to create a "presumption of laches." This principle "presumes" that an action is barred [under the Lanham Act] if not brought within the period of the [state] statute of limitations and is alive [under the Lanham Act] if brought within the period. [Citations omitted.] (Emphasis added.)

*Id.* at 365.

■■■■ Laches bars claims in circumstances where a party engages in unreasonable delay to the prejudice of others, rendering it inequitable to allow that party to reverse a previous course of action. *Plaza Condominium Ass'n, Inc. v. Wellington Corp.,* Ky., 920 S.W.2d 51 (1996). Here, the trial court found Home's delay was unreasonable, and that it prejudiced Colston.

> There is no fixed rule by which to measure the degree of laches which is sufficient to bar the enforcement of a right. Each case must be determined according to its own particular facts and circumstances. [Citation omitted.]
>
> ....
>
> [T]o permit another to build up a reputation ... under a trade-name for a long period of time, and then to assert an

exclusive right to that name and thereby acquire the benefit of the reputation and trade the other has built up, when it lay in the power of the former at any time to have arrested the use of the trade-name by the latter, [is] ... inequitable ... [because] the infringer could have adopted another name and built his reputation on it. [Citation omitted.]

*John P. Dant Distillery Co. v. Schenley Distillers, Inc.*, 189 F.Supp. 821, 826 (W.D.Ky.1960), noting that the law is practically the same whether controlled by Kentucky or federal law. The trial court did not abuse its discretion in determining that Home's claim for past infringement or unfair competition was barred by laches.

Thus, we affirm the Opinion and Order of the Jefferson Circuit Court entered November 16, 1998, and the Opinion and Order entered January 27, 1997, "clarifying the November 16, 1998 order."

ALL CONCUR.